**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARRIOTT INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PRIDE HOTEL, LLC, VIPUL PATEL, KRISHNA K. MEHTA, and CHANDRA MEHTA,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

This action arises out of Defendant Pride Hotel, LLC's wrongful abandonment and breach of its contracts with Marriott International, Inc. (the "Franchise Agreements"). Marriott and Pride Hotel entered into the Franchise Agreements such that Pride Hotel would operate a dual-branded Aloft and Element[1] hotel property in Jamaica, New York (the "Hotels"). But instead of fulfilling its obligations under the Franchise Agreements, Pride Hotel and the other defendants never opened the Hotels as Marriott properties and, instead, entered a lucrative agreement with the City of New York to use the Hotels to house migrants and asylum seekers without Marriott's permission and in violation of the Franchise Agreements.

Marriott thus brings this action to remedy the wrongs against it that Defendants have committed. Marriott alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

---

[1] Aloft and Element are two of Marriott's more than 30 hotel brands.

## PRELIMINARY STATEMENT

1.      After more than eight years of construction and development caused by numerous delays by Pride Hotel, and just months before its deadline to open the Hotels, Pride Hotel willfully breached the Franchise Agreements so it could instead pursue a lucrative government contract to provide shelter to migrants and asylum seekers.  Upon information and belief, Pride Hotel entered into a government contract with the City of New York sometime in 2023 without first obtaining Marriott's prior consent, as required by the Franchise Agreements.  Pride Hotel also failed to properly "deidentify" (i.e., cease use of Marriott's trademarks and branding) before opening the Hotels to the migrants and asylum seekers.

2.      Pride Hotel's wrongful abandonment and breach of the Franchise Agreements and failure to properly deidentify have caused and will continue to cause significant harm to Marriott.  The Hotels are in a desirable and competitive market because of their proximity to the John F. Kennedy International Airport.  But it will be difficult, if not impossible (and even if it were possible, it would likely take many years) for Marriott to re-enter this specific market because it is already saturated with existing hotels.  As a result, Marriott has been effectively shut out of that market.  Thus, in addition to its actual damages (including lost fees for the balance of the contractual term), its right to liquidated damages, and damage to Marriott's goodwill and reputation, Marriott has suffered a significant loss of opportunity in a competitive and desirable market.

## THE PARTIES

3.      Marriott is a Delaware corporation with its principal place of business in Bethesda, Maryland.  In September 2016, Marriott acquired Starwood Hotels & Resorts Worldwide, Inc., including its Sheraton brand, and related entities, including The Sheraton, LLC.  The Sheraton, LLC is the franchisor entity that entered into the Franchise Agreements with Pride Hotel.  After the 2016 acquisition of Starwood Hotels, The Sheraton, LLC became, and is now, part of Marriott.  As part of that acquisition, Starwood assigned to Marriott its interests, rights, and obligations under the Franchise Agreements and related Guarantees.[2]

4.      Pride Hotel is a New York limited liability company that has three members: Jai Patel, Pride Jamaica LLC, and Pride Investors LLC.  Upon information and belief, Jai Patel is a citizen of New York.  Pride Jamaica LLC is a New York limited liability company that, upon information and belief, has two members: Krishna Mehta and Chandra Mehta, who are both citizens of New York.  Pride Investors LLC is a New York limited liability company that, upon information and belief, has two members: Jagruti Patel and Vipul Patel, who are both citizens of New York.  Accordingly, Pride Hotel is a citizen of New York.

5.      Upon information and belief, Vipul Patel is an individual residing in Little Neck, Queens County, New York.  He is a guarantor of Pride Hotel's obligations under the Franchise Agreements, in which he agreed to be served at 86-08 144th

---

[2]      For simplicity's sake, the Complaint thus refers to "Marriott" in place of The Sheraton, LLC, as it relates to the Franchise Agreements and related Guarantees.

Street, Jamaica, New York 11435.

6.    Upon information and belief, Krishna Mehta is an individual residing in Manhasset, Nassau County, New York.  He is a guarantor of Pride Hotel's obligations under the Franchise Agreements, in which he agreed to be served at 100 Ring Road, Suite #300 PH, Garden City, New York 11530.

7.    Upon information and belief, Chandra Mehta is an individual residing in Manhasset, Nassau County, New York.  She is a guarantor of Pride Hotel's obligations under the Franchise Agreements, in which she agreed be served at 100 Ring Road, Suite #300 PH, Garden City, New York 11530.

## JURISDICTION & VENUE

8.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because (1) there is complete diversity of citizenship between Plaintiff, on the one hand, and Defendants, on the other hand; and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.    This Court has personal jurisdiction over Pride Hotel because it is a New York limited liability company and harmed Marriott in New York by breaching its Franchise Agreements here.  In the Franchise Agreements, Pride Hotel further consented to the jurisdiction of "the federal and state courts of the State of New York in any litigation arising out of or related to [the Franchise Agreements] or any other disputes between the Parties."  In so doing, Pride Hotel also expressly "waive[d] all defenses based on lack of jurisdiction or inconvenient venue or forum for any litigation, legal action, or other proceeding[.]"

4

10. This Court has personal jurisdiction over Vipul Patel, Krishna Mehta, and Chandra Mehta because they are New York citizens and guaranteed Pride Hotel's obligations under the Franchise Agreements. In their Guarantees, they likewise consented to the jurisdiction of "the federal and state courts of the State of New York in any litigation arising out of or related to [the] Guarantee[s]." In so doing, they also expressly "waive[d] all defenses based on lack of jurisdiction or inconvenient venue or forum for any litigation, legal action, or other proceeding[.]"

11. Venue is proper before this Court under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants reside in this District and a substantial portion of the events or omissions giving rise to this action took place in this District.

**FACTUAL ALLEGATIONS**

**A.     The Franchise Agreements and Guarantees**

12. On or around June 30, 2015, Marriott and Pride Hotel entered into the Aloft Jamaica Queens Franchise Agreement and the Element Jamaica Queens Franchise Agreement (collectively, the "Franchise Agreements") for the operation of the Hotels, near the John F. Kennedy International Airport.

13. The terms of the Franchise Agreements (which are largely identical between the two Franchise Agreements) that are relevant to the matters in dispute are summarized below. Capitalized terms used below have the meanings set out in the Franchise Agreements, unless otherwise specified.

     a.     **Exhibit A – Hotel and Owner Information and Principal Business Terms**. Pride Hotel will provide its deliverables based on the following Development Schedule:

5

      i.       January 1, 2016 – Pride Hotel to deliver to Marriott complete design development documentation and complete schematic interior design plans.

      ii.       December 31, 2016 – Pride Hotel to have obtained all approvals necessary to Commence Development of Hotels.

      iii.       January 1, 2017 – Pride Hotel to Commence Development of Hotels.

      iv.       January 1, 2020 – Opening Date for Hotels.

b.    **3.1.2 – Compliance with Standards and Policies**. Pride Hotel must operate the Hotels in compliance with all Standards and policies. It may only use the Hotels for the operation of an Aloft and Element dual-branded hotels and not for any other purpose or activity without Marriott's prior approval. Pride Hotel will not engage in any conduct that reduces Gross Rooms Revenue to further other business activities or to take any action which could adversely affect Marriott, the Aloft or Element Brands, the System (including any Trademarks), or the goodwill associated with them.

c.    **Section 3.4.2 – Promotion of Other Hotels**. Pride Hotel shall not divert any business from the Hotels or sell any residential or other lodging product at the Hotels or which use any services or facilities of the Hotels.

d.    **Section 3.6.2 – Major Capital Improvements**. Pride Hotel shall obtain Marriott's approval (which may be withheld at its sole discretion) before making any alterations to the Hotels that materially change the primary use of the Hotels or are inconsistent with the Standards and Policies.

e.    **Section 4.1 – Use of Marriott IP Rights**. Marriott has the sole right and discretion to stablish standards and policies for use of its IP Rights. Any use of its IP Rights in violation of the Franchise Agreements shall constitute infringement, dilution, or misuse.

f.    **Section 4.5 – Infringement**. Pride Hotel shall not, directly or indirectly, dilute, tarnish, or otherwise misuse any Marriott IP Rights.

g.   **Section 7.3.1 – Due Dates**.  Within 10 days after the end of each month, Pride Hotels must pay Marriott its fees, which are calculated based on the Gross Rooms Revenue in that month.

h.   **Section 8.2 – Guarantees**.  Pride Hotel must provide Marriott with a guarantee from Guarantor of Pride Hotel's obligations under the Franchise Agreements.  Execution and delivery of the Guarantees are material considerations to Marriott, without which it would not have entered the Franchise Agreements.

i.   **Section 12.2.1 – Default with Opportunity to Cure**.  Marriott may terminate the Franchise Agreements if Pride Hotel fails to pay any amounts due under the Franchise Agreements (or other applicable agreements), fails to complete any phase of the Development or requirement in the Development Schedule by the deadline in the Development Schedule, or fails to comply with the Standards, and fails to cure any such default within the applicable period set forth in the Franchise Agreements.

j.   **Section 12.2.2 – Immediate Termination**.  Marriott may terminate the Franchise Agreements without providing an opportunity to cure (or on the expiration of any notice or cure period given) if, among other things, Marriott determines the Hotels are being operated in any way that could reasonably be expected to have adverse effect on Marriot, the Aloft or Element brands, the System, or Trademarks; or Pride Hotel does not identify the Hotels to the public as dual-branded Aloft and Element Hotels in accordance with the Franchise Agreements and the Standards and Policies.

k.   **Section 12.2.4 – Liquidated Damages**.  If the Franchise Agreements are prematurely terminated, Marriott will incur damages, including but not limited to the loss of revenue, market representation, and damages to the System and Aloft and Element brands.  Pride Hotel must promptly pay Liquidated Damages if the Franchise Agreements are prematurely terminated.  Marriott is further entitled to pursue equitable or other remedies available to it at law.

l.   **Section 12.4.2 – Deidentification of Hotels**.  Pride Hotel must deidentify the Hotels on termination of the Franchise Agreements, including removing all Marriott IP Rights, Trademarks, and Brand Features.  On termination, Pride Hotel must pay all amounts due and owing.

7

m. **Section 13.1 – Governing Law**. All disputes arising out of or relating to the Franchise Agreements will be governed by Maryland law, without regard to any conflict of law principals.

n. **Section 13.4.5 – Prevailing Party's Expenses**. The prevailing party of this action is entitled to recover all reasonable fees, costs and expenses incurred in connection with this action. If a party prevails on some, but not all, of its claims, it shall be entitled to recover an equitable amount of such fees, costs and expenses, as determined by the Court.

o. **Section 14.4 – Amendments**. Any amendment of a provision of the Franchise Agreements must be in writing executed by the party against whom enforcement of the amendment is sought.

p. **Section 14.5 – Waivers**. A party's delay or failure to require strict performance of any provision of the Franchise Agreements or to exercise any right or remedy available to it shall not constitute a waiver of any breach of the Franchise Agreements or of the right to exercise and right or remedy.

q. **Section 14.6 Economic Conditions**. No downturn in general economic conditions or Pride Hotel's financial ability to perform its obligations under the Franchise Agreements will be a defense to an action brought by Marriott for breach of the Franchise Agreements.

r. **Section 15.4.1 – Owner's Termination Right**. Pride Hotel may only terminate the Franchise Agreements on at least six months' notice to Marriott by paying a Termination Fee to Marriott on or before the termination date, or on notice of less than six months by paying Marriott a Termination Fee multiplied by 1.17 to compensate Marriott for lost revenues during the notice period and its reduced ability to plan for the Hotels' departure from the System.

14. Also on or around June 30, 2015, Vipul Patel, Krishna Mehta, and Chandra Mehta (collectively, the "Guarantors") entered into guarantees (collectively, the "Guarantees") with Marriott. Under the Guarantees, the Guarantors jointly and severally guaranteed all of Pride Hotel's payment and performance obligations under the Franchise Agreements, and agreed to pay all costs, including reasonable legal

fees, incurred by Marriott for collection of amounts due.

15. Throughout the development period, Pride Hotel requested several extensions to the dates required for commencement and completion of construction of the Hotels, and Marriott approved those extensions. The parties entered six amendments to the Franchise Agreements to memorialize these changes to the Development Schedule.

16. In the sixth and last amendment, entered into by the parties on or around June 1, 2023, the parties agreed that Pride Hotel would complete construction and open the Hotels no later than November 1, 2023 (the "Sixth Opening Date Deadline").

**B.    Pride Hotel Abandons the Hotels to Instead Provide Government-Sponsored Migrant Housing**

17. On or about August 14, 2023, while working on a different project at a nearby property, one of Marriott's opening managers noticed that people appeared to be moving into the Hotels.

18. Pride Hotel had not informed Marriott that it had completed the Hotels or opened the Hotels to any guests, so the fact that people appeared to be moving into the Hotels came as a surprise to Marriott.

19. The next day, on or about August 15, 2023, Marriott received a letter from Pride Hotel's attorneys, stating that it was not "economically feasible" for the Hotels to commence operations "[g]iven the poor state of the economy and continued slowdown in the hospitality industry" in the area. The letter also stated that "New York City is pressuring hotels in the metropolitan area to participate in its migrant

housing programs." Pride Hotel thus proposed that the parties enter into an agreement that would allow the Hotels to be used for migrant housing.

20. On or around August 22, 2023, Marriott confirmed that people were already living in the Hotels, even though Marriott never authorized Pride Hotel to use the Hotels for migrant housing.

21. In September 2023, and as a potential compromise, Marriott provided a list of requirements for Pride Hotel to satisfy before Marriott would consider allowing the Hotels to be used for migrant housing. For example, Marriott required that Pride Hotel: (1) enter a Temporary Housing Facility Consent Agreement with Marriott; (2) obtain a Certificate of Occupancy for the Hotels; and (3) obtain a contract with the City of New York for the provision of shelter for migrants or asylum seekers.

22. Despite Marriott's numerous attempts to engage with Pride Hotel following this compromise offer, Pride Hotel failed to respond for over two months.

23. During this two-month period, Marriott received photographs from its opening managers showing that people were still living in the Hotels in late October 2023. Though the Hotels were occupied, Pride Hotel did not remit any fees to Marriott as required by the Franchise Agreements.

24. The November 1, 2023 Sixth Opening Date Deadline—Pride Hotel's extended deadline to complete and open the Hotels—passed with no word from Pride Hotel.

25.    Upon information and belief, at some point in 2023, Pride Hotel entered into an agreement with the City of New York to use the Hotels as a shelter for migrants or asylum seekers without Marriott's knowledge.

26.    At all relevant times, and despite this impermissible Alternative Use of the Hotels, Pride Hotel failed or refused to deidentify the Hotels by removing Marriott-branded signage, proprietary marks, and trade dress.

27.    In November 2023 and again in December 2023, Marriott provided Pride Hotel with notices of default and provided opportunities to cure.

28.    Pride Hotel failed to respond to any of Marriott's notices or to cure its defaults.

29.    On or around March 18, 2024, Marriott thus terminated the Franchise Agreements as a result of Pride Hotel's breaches and failure to cure.  Marriott further demanded that Pride Hotel pay the Liquidated Damages owed to Marriott for the premature termination of the Franchise Agreements within ten days, per the terms of the Franchise Agreements.

30.    To date, Pride Hotel has failed to pay any amounts due under the Franchise Agreements.

31.    Marriott is entitled to all payments, damages, costs, and fees due to it under the Franchise Agreements as a result of Pride Hotel's breach of the Franchise Agreements.

## COUNT ONE
### Breach of Contract

32.     Marriott incorporates as though fully set forth herein Paragraphs 1 through 31 of the Complaint.

33.     In 2015, Marriott and Pride Hotel entered into valid, enforceable contracts (i.e., the Franchise Agreements) for the franchising and operating of a dual-branded hotel property in Jamaica, New York.

34.     The Franchise Agreements provide, among other things, that Pride Hotel:

      a.     must open the Hotels to the public by November 1, 2023;

      b.     may use the Hotels only for operating the Aloft and Element dual-branded hotels and not for any other purpose without Marriott's prior approval;

      c.     may not dilute, tarnish, or otherwise misuse any Marriott IP Rights and must deidentify the Hotels upon termination of the Franchise Agreements;

      d.     must pay Marriott its fees due under the Franchise Agreements based on the Gross Rooms Revenue in each month;

      e.     and must pay Liquidated Damages to Marriott within 10 days of Marriott's invoice following termination.

35.     Pride Hotel breached those contractual terms by:

      a.     failing to open the Hotels to the public by the required Sixth Opening Date Deadline of November 1, 2023;

b.  using the Hotels for an unauthorized Alternative Use (i.e., leasing the Hotels to the City of New York for its migrant housing programs and housing migrants and asylum seekers) without Marriott's consent;

c.  failing to properly deidentify the Hotels before using the Hotels as a shelter for migrants and asylum seekers;

d.  failing to pay Marriott its monthly fees based on the Gross Rooms Revenue Pride Hotels received from its contract with the City of New York to rent the Hotels' guestrooms for use by migrants and asylum seekers;

e.  and failing to pay Marriott the Liquidated Damages required by the Franchise Agreements.

36.  As a result of Pride Hotel's breach of the Franchise Agreements, Marriott has suffered and is entitled to damages, including but not limited to, Liquidated Damages in the amount of $2,603,708 pursuant to Section 12.2.4(a) of the Franchise Agreements.

37.  Marriott is also entitled to recover its attorneys' fees, costs, and expenses incurred in connection with this action, in accordance with Section 13.4.5 of the Franchise Agreements.

38.  All Defendants are jointly and severally liable for the above breaches of the Franchise Agreements pursuant to the Guarantees.

13

WHEREFORE, Marriott prays for the following relief:

(a)    That this Court enter judgment for Marriott and against Defendants on Marriott's breach of contract claims and order all appropriate and attendant relief;

(b)    An order requiring that Defendants specifically perform all post-termination obligations under the Franchise Agreements, including but not limited to, deidentifying the Hotels pursuant to Section 12.4.2 of the Franchise Agreements;

(c)    On order for payment of Liquidated Damages pursuant to Section 12.2.4(a) of the Franchise Agreements by Defendants to Marriott;

(d)    An award of attorneys' fees, costs, and expenses to Marriott per the Franchise Agreements;

(e)    Prejudgment and post-judgment interest; and

(f)    Such other and further relief available at law or equity as the Court deems just and proper under the circumstances.

Dated: August 2, 2024

Respectfully submitted,

/s/ Leo P. O'Toole
Leo P. O'Toole
Benjamin Williams (pro hace vice forthcoming)
Abigail Howd (pro hace vice forthcoming)
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
lotoole@wtlaw.com
bwilliams@wtlaw.com
ahowd@wtlaw.com

*Attorneys for Plaintiff Marriott*
*International, Inc.*

14